UNITED STATES of America, Plaintiff-Appellee,

v.

James W. WILLIAMS, Defendant-Appellant.

Nos. 26829, 26830.

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1970.

We consider the petitions separately and deny them both.

### No. 26829

We reversed the judgment of conviction in No. 26829 [1] because the admission of certain testimony of the witness Jeffrey denied Williams the right of confrontation guaranteed by the Sixth Amendment to the Constitution. On petition for rehearing en banc the Government makes two contentions: (I) It forthrightly challenges that holding; and (II) it contends that the admission of Jeffrey's testimony, if error, does not call for reversal as to counts of the indictment other than counts nine, ten and eleven.

### I. The Admission of Jeffrey's Testimony.

Over explicit and repeated objections of the defendant Williams, the Government was permitted to prove by its expert witness Jeffrey his estimates of the net future earnings, as of January 1, 1967, of two producing oil and gas properties, the Irving properties and the Wilcrof properties, when the records upon which Jeffrey based those estimates were not proved to be correct or even authenticated as the records of the two companies, and were never introduced in evidence.

Irving Petroleum Investment, Inc. and Wilcrof, Inc. were corporations controlled by defendant Ernest M. Hall, Jr. and his brother, Fred L. Hall. As to each of the properties, the indictment charged that the price paid was materially greater than the fair market value of the property. Jeffrey's estimates went to prove those allegations.

Jeffrey had testified that to estimate the fair market value of producing oil and gas properties "the important thing is to determine the future reserve and net income of the property." [2] He then described the steps he took in making an appraisal of the two properties:

J. Edwin Smith, Houston, Tex., for defendant-appellant.

Jonathan S. Cohen, Atty., Tax Div., Dept. of J., Washington, D. C., Morton L. Susman, Anthony J. P. Farris, U. S. Attys., Malcolm R. Dimmitt, James R. Gough, Asst. U. S. Attys., Houston, Tex., Arthur F. Mathews, Stephen E. Gehring, Larry B. Grimes, Paul H. Metzinger, S.E.C., Washington, D. C., of counsel.

Before RIVES, GOLDBERG and GODBOLD, Circuit Judges.

### ON PETITIONS FOR REHEARING

**PER CURIAM:**

The Government petitions for rehearing in Case No. 26829, and Williams petitions for rehearing in Case No. 26830.

---

1. Referred to in our original opinion as Case No. 107, see footnote 2 to original opinion. 424 F.2d 344.

2. Appendix, Vol. IV, p. 1234.

"The first step, of course, is to gather all the information that is available on the property, the map or maps of the leases, any records as to the drilling and completion of the well, electrical logs which are electrical surveys made in the hole showing the characteristics of the formations in which the hole is drilled, core analysis, which are analysis [sic] of samples of the rock which are obtained in the drilling of the wells, past production history of oil or gas, bottom hole pressure, which is the actual pressure of the fluid in the reservoir of rock and any other data which would be of benefit in determining the extent of the reservoir and the nature of the reservoir.

"Then, after this basic data is obtained, the maps are prepared showing the structural contours of the reservoirs, the position of gas or gas caps or water tables. This is the elevation of the water below the oil or gas because the oil and gas will float on the water.

"The thickness of the reservoir rock, which contains hydrocarbons to determine the perosity, the void space in the rock, which is present to contain hydrocarbons, the amounts which contain gas and the amount which contains water, and the amount which contains oil.

"And, after determining all those factors, calculations are made of the volume of the reservoir and the amount of oil and gas present and the amount of recoverable oil and gas in the reservoir.

"Other methods of appraisal are used if there is sufficient production history so that the established production of the trend is noticeable.

"For instance, if a well has been producing for a number of years and has shown a consistent decline in production, then it is possible to extract that to an economic limit and determine the reserves. That is when the operating expenses exceed the income, at which time the production is no longer possible.

"After determining the reserves, records of performance are examined to determine what the operating cost of these properties have been, and what the selling price of the oil is and what the selling price of the gas is, and then economic projections of future income are prepared, using estimates [sic] rates of production by year with the selling price of oil and gas per barrel or per thousand cubic feet of gas to determine the gross income of the property for each year, and then severance taxes, ad valorem taxes and the operating expenses are deducted from the gross operating income to arrive at the net operating income; also any future capital expenditures are deducted from the gross income.

"And after determining the flow or the cash flow of net income by years, it is customary to discount future net income by years, using some discount factor which is usually based on the going rate of interest that a person would have to pay to borrow money, and this is called the discounted future net income, or sometimes called the present net worth of future net income.

"Then, after obtaining the present net worth of future net income, or discounted future net income, there are various methods of arriving at fair market value of the property from that figure.

"Some arbitrary fraction of that figure is usually taken as the fair market value, depending upon the needs or the financial position or the requirements of the purchaser. A property may be worth more to one purchaser than to another, depending on his ability to borrow money on this particular property or depending on the rate of return that he desires on his investment.

"Q. Mr. Jeffrey, you have given a quick summary of a very detailed analysis, I take it, inspection of histories, past financial data available to you, and the steps you take thereupon to make your evaluations, I anticipate that you leave out quite a number of factors, price per barrel of oil being determined by the gravity of the oil, the marketability of the oil of that particular lease, and its position within the field, and its access to pipelines?

"A. Yes. Of course, when a property is evaluated, it is usually known what the going price for crude or gas is in that particular field at that time. Sometimes it is customary or sometimes the evaluation engineer will take into consideration future escalations in the price of oil and gas, but ordinarily that is not done with oil. It's sometimes done with gas, where gas contracts provide for escalation in the price of gas in the future.[3]

" * * *

"Q. In performing your geologic and engineering functions of this appraisal, and outlining the steps of a formal evaluation and appraisal as you did to the jury, were these functions and each of these steps performed in the evaluation of these properties?

"A. Yes.

"Q. Now, generally, what were the general documentations of financial data, geologic reservoir information, well logs, related items with reference to your basis for the evaluation and appraisal, would you generally describe it?

"A. The production, past production performance of the various leases was obtained from State reports, reports which are filed by the operators of the leases with the state in which the leases are located. The electrical logs were obtained from the records of Wilcrof, Incorporated, and Irving Petroleum Investment, Incorporated.

"All data as to core analyses and well records were obtained from the records of Wilcrof, Incorporated and Irving Petroleum Investment.

"Data as to the price of oil and gas was obtained from pipeline run statements which are in the records of the two companies.

"Data as to the operating costs during the year 1966 were obtained from actual operating statements which were in the possession of Wilcrof, Incorporated and Irving Petroleum Investment.

"Q. And based on these various records that you have just outlined before the Jury, were subsequent calculations needed by you to arrive at your opinion?

"A. Yes.

"Q. And were these calculations performed on the data that came from these records you have just named?

"A. Yes.

"Q. And this is an opinion that you have expressed in your evaluation appraisal, is it not?

"A. Yes." [4]

Thus the factual bases used by Jeffrey in preparing his estimates came from reports filed by the operators of the leases as to the past production performance of the various leases and from the records of the two companies as to the electrical logs, core analyses, well records, prices of oil and gas, and operating costs.

We held that Williams was denied his constitutional right to confront and cross-examine the witnesses who prepared and were the custodians of the records on which Jeffrey relied. Among other hurdles to be surmounted before Jeffrey's estimates of value might become admissible, we pointed out that, "[t]here was no proof that the records on which the witness relied were made and kept in such fashion as to meet the requirements of the Federal Business Records Act, 28 U.S.C. § 1732." [5]

---

3. Appendix, Vol. IV, pp. 1234 to 1237.

4. Appendix, Vol. IV, pp. 1241, 1242.

5. We would call attention also that the production reports filed with the state by the operators of the leases do not qualify for admission under the official records statute, 28 U.S.C. § 1733:

"(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept."

That much is conclusively demonstrated by the rationale of Matthews v. United States, 5 Cir. 1954, 217 F.2d 409.

Nonetheless, the Government insists that Jeffrey's expert opinion of value as to each of the properties was properly admitted, arguing:

"(A) It is submitted that this test is here misapplied and that the proper test under the circumstances is not whether the records themselves qualify for admission under an exception to the hearsay rule, but whether the records are such as are ordinarily consulted and relied upon under the practices, usages, and standards of the appraisal profession in like cases. (B) To impose a general requirement upon an expert witness that he consult only such sources as themselves would be admissible under the rules of evidence and particularly without violating the hearsay rule would go far to excluding all expert opinion from criminal trials. In particular, it would wreak havoc with medical and psychiatric testimony which plays a large and doubtless an increasing role in present-day criminal practice."

[Gov't's petition for rehearing, p. 2.]

[The references (A) and (B) have been inserted to facilitate ready reference.]

In thus proceeding from (A) to (B) the Government has indeed made "one giant leap," for, whatever might be the merits or demerits of such a holding, the present decision does not impose any "general requirement" as to the sources which may be consulted by an expert witness. The Government's contention on this score has caused us in the foregoing part of this opinion to extend at some length our references to the record so that there may be no misunderstanding as to what is here decided.

Actually our decision fits neatly into what the Government itself contends to be a correct statement of the law:

"If the witness has gone to only one hearsay source and seeks merely to summarize the content of that source, then he is acting as a summary witness, not an expert. Since he is introducing the content of the extrajudicial statements or writings to prove truth, his testimony, like its source, is hearsay and is inadmissible unless the source qualifies under an exception to the hearsay rule. When, however, the witness has gone to many sources—although some or all be hearsay in nature—and rather than introducing mere summaries of each source he uses them all, along with his own professional experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as an attempt to introduce hearsay in disguise."

[Gov't's petition for rehearing, pp. 3–4] [6]

■ The record shows that Jeffrey went to only one hearsay source for the past production performance of the various leases, namely the reports filed with the state by the operators, and to only one hearsay source for the electrical logs, core analyses, well records, prices of oil and gas, and operating costs, namely the records of the two companies. The fact that his testimony was admitted in the form of an expert's opinion does not by some magical legerdemain remove the stigma of inadmissible hearsay with which its source was infected.

■ Thus we do not think that the Government has successfully met the objection to Jeffrey's testimony as hear-

---

6. In support of this claimed distinction, the Government discusses the following authorities: 3 Wigmore on Evidence, 3rd ed. p. 52; Standard Oil of California v. Moore, 9 Cir. 1957, 251 F.2d 188; Hannan v. United States, 1942, 76 U.S. App.D.C. 118, 131 F.2d 441; H. & H. Supply Co. v. United States, 10 Cir. 1952, 194 F.2d 553; Hammond Lumber Co. v. Los Angeles County, 1930, 104 Cal. App. 235, 285 P. 896; Johnson v. Lowell, 1922, 240 Mass. 546, 134 N.E. 627. It is not our purpose to rule upon whether the quoted statement is an entirely correct statement of the law. However, we do agree in substance with the first two sentences.

say. Assuming, arguendo, that it has done so, we think that the Government is clearly in error when it argues that there are no "different and more stringent requirements of admissibility upon expert opinion evidence in criminal cases than apply in civil cases," and that the right of confrontation is no different or more far-reaching than the hearsay rule (Government's suggestion for rehearing en banc, p. 2). To support that thesis the Government lifts out of context a part of the opinion in Matthews v. United States, *supra* (Government's Petition for Rehearing, p. 3):

> "It has been uniformly held that [the right of confrontation] may not be invoked to exclude evidence otherwise admissible under well-established exceptions to the hearsay rule, and undoubtedly Wigmore is correct in saying, with respect to the Constitutional right to confrontation, 5 Wigmore, Evidence § 1397:
>
> > " 'The rule sanctioned by the Constitution is the Hearsay rule as to cross-examination, with all the exceptions that may legitimately be found, developed, or created therein.' "

217 F.2d at 418.

That quotation was not necessary to the decision in *Matthews*. It overlooked the much earlier opinion in Mattox v. United States, 1895, 156 U.S. 237, 242, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409, where the Supreme Court stated:

> "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, *not only* of testing the recollection and sifting the conscience of the witness, *but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."* (Emphasis added.)

Since the date of our decision in *Matthews, supra,* the Supreme Court has held that, "The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." Barber v. Page, 1968, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255. Again, as recently as June 23, 1970, the Court said:

> "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more nor less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)."

California v. Green, 1970, 399 U.S. 149, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489, 495.

The opinion in *Green* puts beyond doubt that the purposes of confrontation, while they include the right of cross-examination, extend beyond that right:

> "Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to ob-

**1174**

serve the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."

399 U.S. at 158, 90 S.Ct. at 1935, 26 L.Ed.2d at 497.

■ We adhere to the holding that Williams was denied his constitutional right to confront and cross-examine in the presence of the trial jury the witnesses who prepared and were the custodians of the records on which Jeffrey relied.

II. The Erroneous Admission of Jeffrey's Testimony Requires that Williams' Conviction be Reversed in Toto.

Jeffrey testified, over Williams' objection, to the amounts of his estimates of the future net earnings of the Irving and the Wilcrof oil and gas properties as of January 1, 1967. The indictment as returned by the grand jury contained twenty counts (App. 13–37), the last five of which did not mention Williams but named, as defendants, Ernest M. Hall, Jr. and Fred L. Hall. Counts 4 and 5 were dismissed. Williams was arraigned and pleaded not guilty to Counts 1 through 3 and 6 through 15 (App. 2). Count 1 charged Williams and three co-defendants with conspiracy. Counts 2 and 3 and 6 through 15 charged Williams with substantive violations of the mail fraud statute. He was tried and convicted on those 13 counts. A re-examination of those counts convinces us that each contained allegations as to which evidence was relevant to prove the net future earnings as of January 1, 1967 of the producing oil and gas properties in question. Indeed that was the position taken by Williams in his brief on original hearing (pp. 8 and 9),[7] and the Government had not controverted that position prior to its petition for rehearing. We conclude that Jeffrey's testimony related to allegations in the main

body of each of the thirteen counts on which Williams was convicted.

The Government's petition for rehearing in Case No. 26829 is therefore denied.

*No. 26830*

We affirmed the judgment of conviction in No. 26830.[8] The record in that case approaches the ultimate in brevity. It consists of a single count criminal information filed by the United States Attorney (App. 53–59), six one-line special pleas quoted in footnote 12 to our original opinion (App. 60), and a brief stipulation signed by the United States Attorney, the defendant Williams and Williams' attorney (Appendix A to the Government's Answer to Williams' motion for rehearing). By that stipulation the parties agreed:

"1. That all of the facts alleged in the attached Criminal Information (being styled United States of America vs. James W. Williams, Criminal No. 68–H–233), which said information is incorporated herein by reference, are true and correct, and that upon this Stipulation the Court may find that all such facts are conclusively proved beyond a reasonable doubt and are binding on the parties hereto and that the Court may find the defendant JAMES W. WILLIAMS guilty as charged without further evidence.

"2. That the defendant, JAMES W. WILLIAMS, desires to present no additional evidence other than this stipulation on his plea of not guilty to the offense charged in said Criminal Information.

"3. All motions filed heretofore by JAMES W. WILLIAMS in criminal causes numbered 68–H–15 and 68–H–25, shall apply as if filed in the above captioned and numbered cause and the rulings of the Court shall be

---

7. Allegations charged in Count 2 were adopted by reference in subsequent counts.

8. Referred to in our original opinion as Case No. 233, see footnote 3 to original opinion.

the same and apply herein. Defendant does not waive his pleas in bar."

Admittedly, No. 26829 (mail frauds and conspiracy to defraud) and No. 26830 (conspiracy to unlawfully manipulate the price of Westec stock) each had its genesis in the collapse of Westec. However, they involved different crimes, different facts, and required different evidence for conviction. Former jeopardy, therefore, did not bar Williams' prosecution in No. 26830. Blockburger v. United States, 1932, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306; United States v. Ewell, 1966, 383 U.S. 116, 125, 86 S.Ct. 773, 15 L.Ed.2d 627.

That would be true even under the views expressed in Mr. Justice Brennan's separate opinion in Abbate v. United States, 1959, 359 U.S. 187, 196–201, 79 S.Ct. 666, 3 L.Ed.2d 729, for the two prosecutions here involved are not parts of a single transaction but are for different acts. Likewise, Williams can take no comfort from Mr. Justice Brennan's concurring opinion in Ashe v. Swenson, 1970, 397 U.S. 436, 448–460, 90 S.Ct. 1189, 25 L.Ed.2d 469; see also Waller v. Florida, 1970, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435.

In Petite v. United States, 1960, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490, and Marakar v. United States, 1962, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803, judgments of conviction were vacated when the Court granted the Government's motions made "on the ground that it is the general policy of the Federal Government 'that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions, a policy dictated by considerations both of fairness to defendants and of efficient and orderly law enforcement.'" 361 U.S. at 530, 80 S.Ct. at 451. The Government insists that that policy involves the exercise of executive discretion not subject to judicial review and, in any event, that the policy is not applicable. Under the facts and circumstances of these cases, we conclude that

the policy has not been violated, and certainly not in such manner as to deny Williams the equal protection of the law or due process of law.

The petition for rehearing in No. 26830 is therefore denied as is also the petition for rehearing in No. 26829.

Petitions denied.

Before JOHN R. BROWN, Chief Judge, and RIVES, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK and INGRAHAM, Circuit Judges.

### ON PETITION FOR REHEARING EN BANC

BY THE COURT:

A member of the court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that these causes shall be reheard by the court en banc on briefs without oral argument. The Clerk will specify a briefing schedule for the filing of supplemental briefs.