**UNITED STATES of America, Appellee,**

v.

**Benjamin SEEWALD, Contemnor-Appellant.**

**No. 115, Docket 71-1523.**

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 1971.

Decided Nov. 10, 1971.

---

1. See NLRB v. Amalgamated Clothing Workers of America, 5 Cir. 1970, 430 F.2d 966.

Oakes, Circuit Judge, filed opinion concurring in part and dissenting in part.

William E. Dertinger, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. for the E.D. of N.Y., and Edward R. Korman, Asst. U. S. Atty., on the brief), for appellee.

Robert Hermann, New York City (Robert Kasanof, Legal Aid Society, New York City, on the brief), for contemnor-appellant.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Benjamin Seewald was cited for contempt and sentenced to six months in prison by Chief Judge Mishler of the Eastern District of New York when Seewald refused to testify as the key government witness at a trial of six of his coconspirators accused of possession of goods stolen in interstate commerce. Seewald now appeals, asserting that when called as a witness, he properly invoked his Fifth Amendment privilege against self-incrimination so that his refusal to testify was not contemptuous. We disagree and affirm the trial court's decision.

Seewald was charged with the illegal possession in June 1967 of 425 cases of eggs which he knew were stolen during shipment from Georgia to New York, a violation of 18 U.S.C. § 659. On May 13, 1968, he pleaded guilty to a one-count information charging him with this crime. Two months later, he appeared before a grand jury in the Eastern District which was investigating the egg thefts. He was informed of his Fifth Amendment privilege against self-incrimination, but decided to testify, declaring that he had made his decision after consultation with retained counsel. After signing a waiver of immunity, Seewald described in detail the egg thefts including a lengthy explanation of his participation in them as middleman between the hijackers and the ultimate receivers. On the basis of this information, a four-count indictment was returned naming six persons as Seewald's coconspirators and defendants in the egg thefts. Seewald was named as a copossessor of the stolen goods in the first of the four counts, but he was not charged

as a co-defendant, having already pleaded guilty to the information.

The case was finally called for trial April 17, 1971, after delays resulting from pre-trial motions and a backlog of cases due largely to the long delay in filling two judicial vacancies in the Eastern District. Seewald was sworn as the government's first witness. He had apparently advised the United States Attorney that he would refuse to testify and when he so indicated after being sworn, Chief Judge Mishler appointed Simon Chrein, a Legal Aid lawyer to represent him while on the stand. Judge Mishler then adjourned court for an hour so that Chrein could consult with Seewald and familiarize himself with the circumstances of Seewald's refusal to testify. When court reconvened with Seewald present, Chrein told Judge Mishler that he had fully explained to Seewald the possible consequences of a refusal to testify. Judge Mishler asked Chrein whether he agreed that Seewald had no right to refuse to testify and Chrein agreed only as to what Seewald had previously testified to before the grand jury and as to the specific acts to which he had pleaded guilty. After ascertaining that the government intended to examine Seewald only on the matters about which he had testified when before the grand jury, Judge Mishler inquired of Seewald why he refused to testify. Chrein, speaking on Seewald's behalf said, "The defendant has advised me that he does not wish to cause any harm to any of the code-fendants * * * he doesn't wish to hurt anybody." After hearing this, Judge Mishler explained at length to Seewald that if he refused to testify before the trial jury on the following day, he would be held in contempt and sentenced to six months in prison.

The next day, Seewald was sworn as a witness and asked, "Mr. Seewald, were you a defendant in this case at one time?" Seewald responded, "I refuse to testify." Judge Mishler then excused the jury and again advised Seewald that if he persisted in refusing to testify, he would be held in contempt. Seewald was then asked several questions by the government attorney such as, "Mr. Seewald, you don't deny testifying before the grand jury on July 18, 1968, do you?" and "Mr. Seewald, you told me on previous occasions that you knew the defendants and you did business with them, during 1967, isn't that so?" To these questions and several others propounded both by the government attorney and Judge Mishler, Seewald answered, "I refuse to testify," "I refuse to answer," "I refuse to answer any question. I refuse to testify," and "I refuse to testify to anything, any questions asked me." Judge Mishler then held Seewald in contempt. Since Chrein, Seewald's lawyer of the previous day, was not then available, Judge Mishler appointed Edward Kelly, another Legal Aid lawyer, as counsel. The judge then advised Seewald that if he would agree to testify, he could purge himself of the contempt. When Seewald persisted in his refusal to testify, Judge Mishler sentenced him to six months' imprisonment to run consecutively to the sentences he was then serving. In view of Seewald's refusal to testify, the government was unable to prove its case and moved for dismissal of the indictment, which the court granted.

Seewald now claims that the contempt conviction cannot stand because he properly asserted his Fifth Amendment privilege before Judge Mishler. We have set out the pertinent record at some length to show that at no time before Judge Mishler did Seewald intimate that he was asserting his Fifth Amendment privilege. Quite the contrary occurred.

 Although Seewald had earlier determined not to assert his Fifth Amendment privilege before the grand jury after a decision made with counsel's advice and although Seewald had the advice of counsel throughout the proceedings before Judge Mishler, when he refused to testify in the instant case his reason was that he "did not wish to cause any harm to any of the co-defendants * * * he didn't wish to hurt anybody." Every citizen, when called as a witness

in a criminal case, has the duty to testify to the facts known by him regardless of the detriment or benefit such testimony might bring to anyone.[1] If the administration of justice is to function, courts must have the power to discover and compel the disclosure of evidence. Otherwise truth can be concealed and justice can be thwarted at the whim of anyone who prefers not to divulge what he knows. Therefore when it is reasonably clear that a witness is protected against criminal prosecution for any matters regarding which he might testify, then the witness must respond to inquiry or face the consequences of contempt. Only if testimony might incriminate one's self [2] may a defendant refuse to testify. The desire not to hurt a defendant of course has no bearing on the witness's Fifth Amendment privilege and accordingly the Supreme Court has held, "[A] refusal to answer cannot be justified by a desire to protect others from punishment." Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1950).

■ If Seewald had claimed immunity at the grand jury hearing rather than freely testifying, as in fact he did, the government could have granted him immunity and he would have had to testify or face the threat of contempt. Or, if he had asserted his claim at trial— laying aside for the moment whether such claim was any longer available to him—the government could have granted him immunity. But since Seewald neither claimed, nor intimated that he would claim, his Fifth Amendment privilege, the government had no basis under the applicable immunity statute, 18 U.S.C. § 6002–03, on which to grant him immunity. It was Seewald's own failure to assert the privilege which prevented the government from immunizing him, under the statutory procedure available, from the prosecution which he allegedly feared. The failure to assert the privilege as the basis for his refusal to testify is, by itself, sufficient ground on which to base the contempt citation. To hold otherwise would mean that Seewald would be in a better position by failing to claim immunity and then refusing to testify than he would be if he had asked for and received immunity.

■ Moreover, Seewald's refusal to answer covered not only potentially incriminatory questions, but all questions. Seewald repeatedly refused to answer questions the answers to which in no way could have incriminated him. This refusal to answer questions which were not incriminatory in themselves also is a sufficient ground on which to sustain the contempt citation.

Seewald has asserted in this court that the reason he did not claim his Fifth Amendment privilege was that he was improperly advised as to its availability. He argues that Chrein should not have agreed with Judge Mishler that the privilege was unavailable as to his grand

---

1. Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 501; C. McCormack, Handbook of the Law of Evidence § 130, at 274; see Ellis v. United States, 135 U.S.App.D.C. 35, 416 F.2d 791, 801–802 (1969) where Judge Leventhal wrote:

 It would impede sound law enforcement if an implicated but cooperating witness can decide, after he has made disclosure to the grand jury, that he will refuse to testify at trial. The Government may have structured its case around this witness, and be unable at a late hour, often after jeopardy has attached, to recast an investigation. Leads that might have been explored in the past, with expenditure of much money and time, and were put aside with this witness's cooperation, may now be lost beyond retrieval. The witness may have obtained an effective immunity for himself, especially if the investigation ripened just before the expiration of the statute of limitations, and then be able to balk all prosecution. And even a cooperative witness may be made vulnerable, by a doctrine that gives him choice, to the threats and blandishments of the defendant. There are doubtless other considerations of like import, but these suffice to establish the interest of law enforcement.

2. Or if another privilege, e. g., attorney-client privilege, were applicable.

jury testimony and apparently further asserts that if he had been properly advised he would only have claimed his privilege when appropriate. We can see no basis for the claim that Seewald was not properly advised by counsel. However, going one step further, Seewald argues, on the assumption that he should have been advised that he could have refused to testify on Fifth Amendment grounds, that this court's decision in United States v. Miranti, 253 F.2d 135 (2d Cir. 1958) precludes a finding of contempt in the instant case. We do not agree.

In *Miranti,* the defendant Miranti had testified before a grand jury regarding a scheme to injure one Victor Riesel, who was scheduled to appear before another grand jury investigating racketeering. After such testimony, which was given without a request for immunity, Miranti was indicted and convicted of conspiring to remove a felon (the actual perpetrator of the assault on the prospective grand jury witness) from New York. Miranti was then brought to testify as the chief government witness in the trial of his coconspirators. He refused to testify and trial was adjourned. The grand jury which had returned the indictment against him was reconvened to investigate the alleged intimidation behind his refusal to testify. Miranti was brought before the grand jury and asked to acknowledge his previous grand jury testimony. He refused, claiming his Fifth Amendment privilege, and was then held in contempt and sentenced to five years imprisonment. This court reversed. Finding that Miranti could have been convicted of the substantive crime of obstructing justice and that a subsequent prosecution was not absolutely barred, the court held that Miranti was in sufficient jeopardy to make the privilege applicable. Reiteration of his prior grand jury testimony could not be demanded under penalty of contempt because

"Even though the prior statements also would be admissible at [a later] trial, the requested acknowledgments would add to their credibility and could have led to additional admissions on this grand jury proceeding exacted through the waiver route, [citations omitted] which also would be admissible at a possible trial for the substantive crimes." 253 F.2d at 138.

*Miranti* thus rests on three grounds. First, that the defendant was in jeopardy because of potential later prosecutions; second, that reiteration of his prior grand jury testimony was incriminatory; and, third, that the inquiry before the grand jury could have led to additional incriminatory admissions. None of these conditions obtain in the instant case.

■ To claim his Fifth Amendment privilege Seewald must have had a "reasonable cause" to apprehend danger from a direct answer. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). There was no realistic possibility that the government would have instituted further proceedings against him had he testified. Under the circumstances reiteration of his testimony would not have tended to incriminate him. Ellis v. United States, 416 F.2d 791, 803, 135 U.S.App.D.C. 35 (1969). Thus Seewald had no "reasonable cause" to apprehend danger from further prosecutions. In the absence of such potential jeopardy, he could not claim the Fifth Amendment privilege.[3]

Moreover, the instant case differs substantially from *Miranti.* There it was reasonable to assume that the grand jury which was exploring a new set of facts, presumably as the basis of further indictments, would not have halted its inquiry once Miranti had re-stated his

3. Seewald suggests that he was in jeopardy because if he had lied at the grand jury proceeding and wanted to tell the truth at trial, he would have been subject to a perjury conviction. Of course he never made such a claim before Judge Mishler. Obviously such a claim is completely contrary to the reason his counsel gave to Judge Mishler, namely that he did not want to harm any of the co-defendants.

earlier testimony. In the instant case, the breadth of the testimony was limited by the indictment. Seewald would have had to testify only as to those statements, and the surrounding details, that he had made before the grand jury. The trial judge was alert to the possibility that if Seewald had to testify to matters about which he had not testified before the grand jury, such testimony might freshly incriminate him. Thus Judge Mishler had been assured by government counsel that the inquiry was to go no further than had the grand jury testimony. With the trial judge ready to circumscribe the scope of the prosecution's questions to matters about which Seewald had already testified, we do not think that there was any reasonable probability that Seewald's testimony would have led to his further prosecution for other crimes. Unlike *Miranti*,[4] where an exploratory grand jury was seeking to uncover new facts, in the instant case reiteration of Seewald's earlier testimony was all that the government sought.

Affirmed.

**OAKES, Circuit Judge:**

I concur in the result on the basis that I agree that Seewald's refusal to answer covered all questions, not just potentially incriminatory ones. *See* Landy v. United States, 283 F.2d 303 (5th Cir. 1960), cert. denied, 365 U.S. 845, 81 S.Ct. 805, 5 L.Ed.2d 810 (1961). I cannot agree, however, with that portion of the opinion holding that he had no "reasonable cause" to apprehend danger. Department of Justice "policy," even when reinforced by the Solicitor General's confessions of error when the policy is not followed, as in Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), and Marakar v. United States, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 (1962), does not sufficiently safeguard a defendant, already convicted of substantive crime, from further incrimination when he is called to testify to the same transactions. See Brennan, Black

and Douglas, JJ., in Petite v. United States, *supra* at 533, 80 S.Ct. at 450, 4 L.Ed.2d at 490 (separate opinion). Departmental policy can be changed and involves executive discretion not subject to judicial review. See United States v. Williams, 431 F.2d 1168, 1175 (5th Cir. 1970). I do not join in that portion of the opinion relating to United States v. Miranti, 253 F.2d 135 (2d Cir. 1958).

---

4. In our view the application of *Miranti* should be strictly limited to similar fact situations.