STATE of South Dakota, Plaintiff
and Appellee,

v.

Jon E. ESSLINGER, Defendant
and Appellant.

No. 14442.

Supreme Court of South Dakota.

Argued Sept. 12, 1984.
Decided Nov. 14, 1984.

Rehearing Denied Dec. 6, 1984.

Jon R. Erickson, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Richard Braithwaite of Braithwaite Law Offices, Sioux Falls, for defendant and appellant.

WUEST, Acting Justice.

Appellant Jon E. Esslinger (appellant) was convicted by a jury on two counts of murder in the first degree and one count of receiving stolen property. He received two life sentences and one five-year sentence, to run concurrently. We affirm.

On August 6, 1982, appellant escaped from a jail in Kearney, Nebraska. He stole some clothing and a Plymouth car and drove to South Dakota. On the evening of August 7, he was seen near Dixon, South Dakota, talking to Paul Eagle Star (Eagle Star) and Alvin Willard (Willard), two young Indian men.

On August 8, 1982, Bob Van Zee (Van Zee) called the State Police Radio. He reported talking with an individual by the name of "Jon" at the D & D Marina, a few miles from Dixon. Jon told Van Zee that he had broken out of jail in Kearney, Nebraska, stole the gray Plymouth Volare automobile he was driving, picked up a couple of Indians at the North Star Saloon and beat them up with a pipe and jack wrench, which he threw in the river. Van Zee gave the police radio a description of Jon, the automobile, and its Nebraska license number. Other people at the marina later confirmed overhearing parts of the conversation.

After calling the police radio, Van Zee visited with Jon until a Highway Patrolman arrived. When the patrolman arrived, he chased Jon down a dirt trail behind the marina where appellant abandoned the stolen automobile. A search of the vehicle disclosed a knife under the driver's seat, a screwdriver and a pair of prison-type coveralls. On August 9, the two victims were reported missing. Also, on August 9, appellant surrendered to a deputy sheriff at a roadblock near the marina. He was returned to the Nebraska State Penitentiary. The stolen Plymouth Volare, which had been impounded, was searched again on August 13 and Sheriff Oliver removed a jack handle. On August 14, an air and ground search was conducted for the two missing men near Dixon.

On August 27, appellant made incriminating statements to the chaplain at the Nebraska Penitentiary, which statements were relayed by the chaplain to Sheriff Oliver.

On September 3, while tilling his field, a local farmer found two badly decomposed bodies which, by the use of dental records, were identified as Eagle Star and Willard. Dr. Brad Randall, a forensic pathologist, who performed autopsies on the two bod-

ies, stated the cause of death was multiple trauma or injuries to the skull and head.

■ The first issue on appeal is whether the indictment alleging seven counts is defective because the grand jury voted on the indictment, in its entirety, and not separately as to each count.

At the time of the indictment in this case, SDCL 23A-5-18 provided: "An indictment may be found only upon the concurrence of six or more jurors." The minutes of the grand jury show six grand jurors concurred in the indictment against appellant.

An indictment is "a plain, concise and definite written statement of the essential facts constituting the offense charged." SDCL 23A-6-4. "Two or more offenses may be charged in the same indictment ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together ...." SDCL 23A-6-23.

Appellant cites *Eubanks v. State*, 5 Okl.Cr. 325, 114 P. 748 (1911), in support of his claim that the indictment should have been dismissed. In *Eubanks*, sixteen indictments were returned and only three votes were taken. The clerk of the grand jury was unable to state which indictments were voted upon, nor could any of the other grand jurors. The Oklahoma Court said:

> In the proceedings had in this case, evidently the grand jury did not proceed with that deliberation that the law requires. The law requires that the concurrence of the necessary number of grand jurors be indicated by a vote or ballot on each indictment, and, if a separate vote or ballot is not taken, then there can be no lawful concurrence of the necessary number of grand jurors.

5 Okl.Cr. at 333, 114 P. at 752. In *Eubanks*, there was no way for the court to determine which indictments had been vot-

ed upon, and the grand jury had only voted upon three of them.

In the case at bar, there was only one indictment and the minutes disclosed that it was voted upon as required by SDCL 23A-5-18. SDCL 23A-5-6 provides: "The clerk shall keep a record of the number of the jurors concurring in the finding of every indictment ...." This was also done. The trial court did not err in overruling the motion to dismiss.

Dr. Randall was furnished a printed copy of the dental records of Willard and telephonically given dental records of Eagle Star. Over objection, he was permitted to testify the dental records were consistent with the bodies he examined. The trial court relied upon SDCL 19-15-3,[1] Federal Rule 703, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Appellant made it very clear in his rebuttal brief that he does not claim dental records do not fall within the type reasonably relied upon by experts in the field of body identification. Rather, he claims that because the dental records of Willard were ten years old, and those of Eagle Star were four to five years old, both mouths were still in a growth period and dental change could be expected. Further, since Dr. Randall testified that records of this kind were relied upon by experts "sometimes," these particular records did not meet the test "of a type reasonably relied upon by experts in the particular field[.]" It was stated in appellant's reply brief thus:

> We simply claim that these *particular* dental records are not of a type reasonably relied upon. The State's own expert

---

1. For criminal cases illustrative of problems in the use of facts or data contemplated by SDCL 19–15–3, *see United States v. Williams*, 431 F.2d 1168 (5th Cir.1970), aff'd en banc, 447 F.2d 1285 (5th Cir.1971), cert. denied, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972); *United States v. Lawson*, 653 F.2d 299 (7th Cir.1981); *State v. Russo*, 38 Conn.Sup. 426, 450 A.2d 857 (1982).

testified that whether the age of dental records would affect comparison depended upon the circumstances (T 862). He admits that dental records such as the ones involved here are of a type sometimes relied on—and ...

■ We believe the objection of appellant went to the weight of the evidence as distinguished from its admissibility. Whether or not a dental record can be relied upon to identify a body necessarily depends upon the circumstances. A fair interpretation of Dr. Randall's testimony indicated a dental record may or may not be helpful in the identification of a body, as distinguished from the interpretation of his remarks urged by appellant. Accordingly, the trial court did not err in overruling the objection.

During the course of the trial, several persons identified appellant and testified concerning things they had seen him do or heard him say. Eighteen individuals were asked to identify appellant as having been at either the North Star Saloon, Dixon Housing, the D & D Marina, the Verdral farm, or the Chocholousek residence on the weekend of August 7 through August 9, 1982. Motions to suppress these identifications were held both prior to trial and during trial. The trial court refused to suppress any of the out-of-court or in-court identifications.

Four separate out-of-court identification procedures were used, including a one-photo and four-photo display and two seventeen-photo displays. Following the disappearance of the victims, Deputy Sheriff Darrell Pepper displayed a single photograph of appellant to eleven of the eighteen persons asked to identify appellant at trial. Subsequently, Deputy Pepper showed three of the eighteen persons a display containing four photographs. Later, a seventeen-photo display was shown to six of the individuals, and finally, another seventeen-photo array was shown to all eighteen individuals asked to testify at trial.

Appellant contends that the one-photo and four-photo displays were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and should therefore have been suppressed. Appellant further contends that inasmuch as the remaining seventeen-photo displays were tainted by the one and four-photo displays, they too should have been held inadmissible at trial.

In *State v. Iron Thunder*, 272 N.W.2d 299, 301 (S.D.1978), this court stated:

It is well settled that in-court identifications are not admissable at trial when they stem from a photographic identification lineup procedure that is so impermissibly suggestive as to result in a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Barcley*, [88 S.D. 584,] 225 N.W.2d 875 (1975); *State v. Sahlie*, [90 S.D. 682,] 245 N.W.2d 476 (1976). The burden of establishing the impermissable suggestiveness of the photographic lineup is upon the party seeking to suppress the evidence.... However, even though the photographic lineup may be considered to be impermissibly suggestive, the in-court identification is admissible upon the state's showing, by clear and convincing proof, that the in-court identification had an independent origin, i.e., based upon observation of the witness other than the photographs shown to the witness. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *State v. Sahlie, supra.*

■ The initial determination as to whether a photographic lineup was impermissibly suggestive is, to a great extent, a subjective one. *Iron Thunder, supra.* However, the one-photo array is inherently suspect, and has been consistently condemned by the courts as impermissibly suggestive. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Iron Thunder, supra.* The testimony of the witnesses at the suppression hearing in this case demonstrates

the impermissible suggestiveness of the one-photo display. In each instance, the person shown the single photograph had been previously advised that the individual was an escapee from Kearney, Nebraska, and was suspected of murder. The photograph of appellant showed a police identification board with Kearney, Nebraska, displayed upon it.

It appears to this court that the four-photo lineup was also impermissibly suggestive. In *Iron Thunder*, this court held impermissibly suggestive a six-person photo array, where five of the photographs portrayed subjects with identification boards and one without, because the procedure suggested that the subject without the identification board was the current suspect.

In the instant case, all of the witnesses who testified were aware that appellant was an escapee. Although the authorities blocked out the identification board on the photograph of appellant, there were only four photographs shown, which tended to increase the emphasis on the one that was different. Thus, it would be obvious to anyone aware of appellant's prisoner status that the area eradicated from his photograph was the identification board and that he was the suspect in question.

■ We turn now to the question of whether the seventeen-photo arrays subsequently shown to witnesses who had viewed the one and four-photo arrays were tainted so as to render them impermissibly suggestive as well. We find that these subsequent displays were tainted inasmuch as the cumulative effect of seeing appellant's photograph in the previous one and four-photo arrays, coupled with the later view of these seventeen-photo arrays, was to single appellant out as the suspect from among the other persons photographed. The evidence, however, indicates that four of the witnesses called to testify at trial did not view the one and four-photo arrays but only the subsequent seventeen-photo arrays. We cannot say that appellant has carried his burden of showing that the seventeen-photo arrays were impermissibly suggestive as viewed by these four witnesses.

Having determined that the one and four-photo arrays were impermissibly suggestive, we must now consider whether the in-court identification of appellant as the suspect had an independent origin.

On previous occasions, this court has dealt with the problem of proving independent origin for identifications in situations where the lineup procedures were deemed improper. This court faced the problem for the first time in *State v. Keeling*, 89 S.D. 436, 233 N.W.2d 586 (1975). Although appellant in that case had been subjected to an improper lineup procedure, it was ruled that the in-court identifications of appellant by the witnesses were not so tainted by the improper procedures so as to make the in-court identifications inadmissible. This court has followed the analysis of the United States Supreme Court in *United States v. Wade*, 388 U.S. 218, 219, 87 S.Ct. 1926, 1928, 18 L.Ed.2d 1149 (1967), where the court found that the question of whether the in-court identification was "purged" of the taint required consideration of various factors.

■ Examination of the record in this case discloses ample evidence of the independent origin of the identification of appellant at trial. As previously stated, four of the individuals identifying appellant at trial viewed only the seventeen-photo arrays which were not impermissibly suggestive. The transcript also shows appellant maintained a high degree of visibility during his brief stay in the Dixon area. He spoke to several individuals about his recent escape and encounter with the victims; a story which insured him a great deal of attention from his listeners. In fact, enough attention was given that one trial witness called the police and relayed appellant's story. Appellant was also identified by the peculiarity of his hairstyle and the scars on his chest. Finally, appellant elected to take the stand at trial and, during the course of his testimony, he admitted beating the victims. As to this, we held in *State v. Johnson*, 87 S.D. 43, 202 N.W.2d

132 (1972), that an in-court identification of appellant was merely cumulative evidence, and appellant's identity was no longer an issue in view of the fact that he made two separate admissions. While appellant in this case did not admit guilt, but pled excusable and justifiable homicide, his admission as to his presence at the scene of the homicide further identifies him as the perpetrator.

We therefore hold that the in-court identification was purged of the taint of the suggestive photographic lineups.

On August 27, 1982, approximately three weeks after the deaths of the victims in this case, appellant made a statement to a chaplain at the Nebraska State Penitentiary implicating him in the homicides. By pretrial motion, appellant asked the trial court to suppress not only the statement made to the chaplain, but also any information derived from that statement by law enforcement authorities. Appellant contends that such information is inadmissible under the "fruit of the poisonous tree" doctrine recited by the United States Supreme Court in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The trial court suppressed the statement made to the Nebraska chaplain, but held that evidence derived therefrom was not a fruit of that poisoned tree. We agree.

In *Wong Sun*, the Supreme Court held that the exclusionary rule announced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), extended not only to evidence illegally obtained but also to direct and indirect products of such evidence. The *Wong Sun* Court, however, also recognized that the exclusionary rule and the fruit of the poisonous tree doctrine are not applicable when law enforcement authorities learn of such evidence from an independent source.

■ Recently, in *United States v. Jacobsen*, — U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court held that Fourth Amendment protection from unreasonable searches and seizures proscribed only governmental action. In that case, a Federal Express employee inadvertently damaged a tube containing some white powder and notified the authorities. The Court stated that because the initial invasion of the appellant's package was occasioned by private action, it did not violate the Fourth Amendment. By analogy, in the instant case, the Nebraska chaplain's communication to law enforcement officials regarding the statement made by appellant constituted "private action" and did not violate the Fourth Amendment. Accordingly, any information derived therefrom was admissible.

Appellant claims that at the time the State's case-in-chief was completed the court should have granted his motion for acquittal on the murder counts. He argues the evidence, mostly circumstantial, was not sufficient to support a verdict of guilty. He concedes the trial court had to resolve all conflicts in the evidence and inferences that could be drawn from the evidence in favor of the State at the end of its case-in-chief. In the case of *State v. Bult*, 351 N.W.2d 731, 734 (S.D.1984), this court held:

The trial court must consider the evidence in the light most favorable to the nonmoving party when ruling on a motion for judgment of acquittal and must give the nonmoving party the benefit of all reasonable inferences in its favor.

*Citing State v. Decker*, 317 N.W.2d 138 (S.D.1982); *State v. Gallegos*, 316 N.W.2d 634 (S.D.1982); *State v. Vogel*, 315 N.W.2d 321 (S.D.1982).

■ In reviewing this decision of the trial court, we review the same evidence as distinguished from a final verdict. In reviewing a verdict, the scope of review is to accept " 'that evidence, and the most favorable inferences that can be drawn therefrom, which will support the verdict'." *State v. Luna*, 264 N.W.2d 485, 488 (S.D. 1978). "The established rule in this state is that to warrant conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with guilt of the party charged, and such as cannot by any reasonable theory be true and the party

charged be innocent." *State v. Thomas,* 78 S.D. 568, 574, 105 N.W.2d 549, 552 (1960).[2] This rule does not mean the evidence must be such as to exclude every possible hypothesis of innocence. Rather, it requires only the exclusion of reasonable hypothesis of innocence. *State v. Robb,* 303 N.W.2d 368 (S.D.1981); *State v. Thomas,* 78 S.D. 568, 105 N.W.2d 549 (1960).

■ Briefly summarized, the facts at the close of the State's case disclosed the following. Appellant escaped from jail in Kearney, Nebraska, on August 6, 1982, stole a car and three pairs of jeans. The next evening he was seen in this car with the victims at the North Star Bar near Dixon, South Dakota, where all three were drinking alcoholic beverages. One of the stolen jeans was found on a fence line near the bodies of the victims. Appellant was wearing another pair of the stolen jeans when arrested. His clothing had both type A and O bloodstains. Appellant had type A blood and the two victims had type O. Shoes and jewelry belonging to Willard were found in a ditch near the bodies, and a comb similar to one owned by Eagle Star was found in the same ditch. Eagle Star was fifteen years old and Willard was twenty-four. One of the bodies was a boy in his mid-teens and the other man in his late teens or early twenties. Both victims had died from blows to the head and none of the victims' relatives had seen them since August 7, 1983. Both victims were Indians, and on August 8, 1982, appellant told witnesses at the D & D Marina he had a fight with two Indians and leveled them with a jack wrench or pipe, leaving them in a field. When the automobile was stolen, it had a jack in it but, when it was retrieved after appellant's arrest, only a portion of the jack was found in it. A part of a similar jack was found in a ditch near the bodies, on which was found hair similar to that of the victims. The dental records of both victims were consistent with the two bodies. The victims were last seen with appellant. Appellant told Sheriff Oliver, "a hundred years ago, I would have gotten a medal instead of being charged with murder." In view of this evidence, we believe the court properly denied the motions for acquittal.

As a defense to the killings, appellant claimed self-defense. He claimed a homosexual contact while driving down the road with the victims. Appellant started to drive in a "nutty" fashion and the homosexual activity ceased. The car was stopped and appellant got under it to ascertain the cause of a peculiar noise. He claimed that while under the car someone stomped on his ankle, and when he got out from under the car they kicked him in the stomach, held him around the neck, and invited him to perform a homosexual act. At that time, Willard tried to get appellant's pants down and threatened him with a knife. Appellant testified Willard then came at him with a knife, but he lunged to one side and kicked Willard in the face. At the same time, appellant rammed his elbow into Eagle Star's stomach and made him let go. Appellant claimed to have grabbed the jack, hitting one, then the other. They began chasing him around with knives. Appellant was backed up into a fence and, being unable to retreat any further, he hit them with the jack until they were not coming at him any longer.

The court instructed the jury on self-defense, which is justifiable homicide. SDCL 22-16-35. Appellant claims the court should have instructed the jury on excusable homicide. He proposed an instruction containing both excusable and justifiable homicide. The portion relating to excusable homicide provided as follows:

Homicide is excusable when committed by accident and misfortune in any of the following ways:

1. In doing any lawful act with unusual and ordinary caution, or

2. In the heat of passion; upon sudden and sufficient provocating, or upon

2. In *State v. Luna,* 264 N.W.2d 485 (S.D.1978), we approved an instruction based on the foregoing terminology, although we quoted from *State v. Best,* 89 S.D. 227, 232 N.W.2d 447 (1975), which used the terminology "any rational hypothesis," rather than any "reasonable theory."

a sudden combat; provided that no undue advantage is taken nor any dangerous weapon used, and that killing is not done in a cruel or unusual manner.

This proposed instruction, which the court refused, is paraphrased from SDCL 22–16–30 and SDCL 22–16–31.

■ A defendant is entitled to an instruction on his theory of defense if there is evidence to support it and a proper request is made. *State v. Kills Small*, 269 N.W.2d 771 (S.D.1978). Conversely, he is not entitled to an instruction if there is no evidence to support his theory. *State v. Zemina*, 87 S.D. 291, 206 N.W.2d 819 (1973); *State v. Johnson*, 81 S.D. 600, 139 N.W.2d 232 (1965); *State v. Stumbaugh*, 28 S.D. 50, 132 N.W. 666 (1911). Appellant's theory in this case was clearly self-defense. According to his testimony, he was being attacked by the decedents and was defending himself.

Appellant claims the court should have instructed on excusable homicide because self-defense is a lawful act and SDCL 22–16–30 provides homicide is excusable when committed by accident and misfortune doing any lawful act, with usual and ordinary caution. Self-defense is a lawful act when the circumstances provided by SDCL 22–16–35 are met, which is justifiable homicide and the theory upon which the jury was instructed.

Nor, was there any evidence these homicides were done in the heat of passion, upon sudden and sufficient provocation or upon a sudden combat, with no undue advantage being taken; or, any dangerous weapon used and the killing not done in a cruel or unusual manner.

■ Decedents were killed by blows to the head with a portion of an automobile jack. This instrument and the manner in which it was used constituted a dangerous weapon, as defined by SDCL 22–1–2(9). Therefore, the trial court did not err by refusing the proposed instructions on excusable homicide.

In Count VII of the indictment in the case at bar, appellant was charged with receiving stolen property, pursuant to SDCL 22–30A–7, which provides:

Any person who receives, retains or disposes of property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained or disposed of with the intent to restore it to the owner, is guilty of theft.

The property in question is the gray Plymouth Volare abandoned by appellant shortly before his apprehension near the D & D Marina. Appellant contends that inasmuch as the uncontradicted evidence leads to the conclusion the automobile was stolen by him, as the thief, he cannot be convicted of receiving or retaining stolen property under South Dakota law.

This court has held the crimes of grand larceny and receiving stolen property are distinct offenses. *State v. Pickering*, 88 S.D. 548, 225 N.W.2d 98 (1975); *State v. Houghton*, 75 S.D. 207, 62 N.W.2d 342 (1954); *State v. Mosher*, 46 S.D. 336, 192 N.W. 756 (1923).

However, our criminal code was recodified in 1976, changing the definition of receiving stolen property. This change was modeled after Model Penal Code section 223.6. Recently, in *State v. Howell*, 354 N.W.2d 196 (S.D.1984), we declined under the facts of that case to rule whether or not the thief could be convicted under SDCL 22–30A–7.

According to the commentary on Section 223.6 of the Model Penal Code (1980), the traditionally distinct crime of receiving stolen property has been incorporated into the law of theft. At least twenty-four states have adopted this innovation. American Law Institute, Model Penal Code and Commentaries, 231–234 (1980).

Consolidation of receiving with other forms of theft affords the same advantages as are involved in other aspects of the unification of the theft concept. Consolidation reduces the opportunity for technical defenses based upon legal distinctions between the closely related activities of stealing and receiving. One

who is found in possession of recently stolen goods may be either the thief or the receiver. If the prosecution can prove the requisite state of mind to deprive the true owner of the property, it makes little difference whether the jury infers that the defendant took directly from the owner or acquired the goods from another person who committed the act of taking. Consolidation also has a consequence favorable to the defense by precluding conviction of both offenses for the same transaction.

We conclude that a thief may be convicted of receiving stolen property; however, he cannot be convicted of both theft and receiving stolen property. In a factual situation wherein he may be found guilty of either, the jury should be instructed to return a verdict of one or the other, to avoid double jeopardy.

Appellant has urged error in the admission of certain items of clothing and other personal items found at the scene of the crime. Primarily, his objections were to adequate identification of the items. We believe the items were adequately identified and his objections went to the weight of the evidence rather than to its admissibility.

We have carefully considered appellant's other assignments of error and find them to be without merit.

FOSHEIM, C.J., and WOLLMAN and MORGAN, JJ., concur.

HENDERSON, J., concurs in result.