STATE, Respondent v. ZEMINA, Appellant

(206 N.W.2d 819)

(File No. 10926. Opinion filed May 4, 1973)

Order denying petition for rehearing June 18, 1973

Charles Rick Johnson, Gregory, for defendant and appellant.

Gordon Mydland, Atty. Gen., David Stanton, Asst. Atty. Gen., Pierre, Mike Grossenburg, State's Atty., Tripp County, Winner, R. James Zeiser, Pierre, for plaintiff and respondent.

WOLLMAN, Justice.

Defendant was charged with murder. He was convicted of the lesser included offense of first degree manslaughter and was sentenced to life imprisonment in the South Dakota State Penitentiary.

The victim of the offense, one Kenneth Fernen (Fernen), resided with his family on a ranch located approximately 15 miles southeast of Mission, South Dakota. Sometime after noon on November 8, 1969, Fernen drove to the nearby Nebraska towns of Kilgore and Crookston to purchase some parts for his hay baler. At approximately 5:15 that afternoon, Fernen stopped to visit with a neighboring rancher, James Epke, and the two men each had one can of beer while they sat in Fernen's pickup truck and visited.

At approximately 5:45 that afternoon, Constance Fernen Grablander, who was living with her parents at the time while her husband was serving in Vietnam, left the Fernen residence to drive to her place of employment in Mission. As she drove west toward the main road to Mission, Connie met and passed defendant's eastbound tractor and hay baler. She then approached a tractor being driven by defendant's brother, Bruce Zemina (Bruce), which was pulling a cable type stack mover, referred to by all of the witnesses as a hay sled. As Connie approached the eastbound tractor and hay sled the tractor started angling toward her vehicle. She testified that Bruce shook his hand in the air and shouted at her. Frightened Connie drove into the ditch on the north side of the road to avoid being struck by the tractor. After pulling around the hay sled she met her father, who was driving east in his pickup directly behind the tractor and hay sled. She stopped and had a conversation with him, during which she referred to defendant and Bruce as "that crazy outfit," to which her father replied, "Yeah, they are a dumb outfit. I have been trying to pass them and they won't let me pass." Upon being told by Connie that Bruce had yelled at her, Fernen became rather upset. After some further conversation, Fernen told Connie to proceed to work since it was then approximately 5:55 p.m. and she was supposed to start work at 6

o'clock. Connie testified that by the time her three or four minute conversation with her father came to an end Fernen had gotten over his irritation at the fact that Bruce had apparently tried to run Connie off the road and had yelled at her. As Connie started to drive away, she noticed in the rear view mirror of her car that defendant was coming back toward her father's pickup. At no time during his conversation with his daughter did Fernen make any threats toward either the defendant or Bruce, nor did he indicate to Connie that he was going to do anything about the fact that they had apparently tried to force her off the road.

At approximately 6 p.m. that evening, Kenneth Fernen, Jr. and John Chauncey left the Fernen ranch and started toward Rosebud. They came upon Fernen's pickup truck parked on the road behind the Zemina tractor and baler. The door on the driver's side of the pickup was closed. The two boys discovered Fernen lying wounded on the ground near the open right door of the pickup. Although Fernen was still alive he was unable to talk. When Kenneth, Jr. attempted to move the pickup in order to shine lights on the scene, he discovered that the keys were missing. They were later found lying in the weeds at a point 20 to 25 feet north and slightly west of the driver's door of the pickup. The soil in the area where Fernen's body was found indicated that there had been a good deal of scuffling on the passenger's side of the pickup. The tubular magazine from Fernen's .22 caliber rifle was found lying on the ground near the body. The rifle itself had been seen by Mr. Epke and Connie Grablander in the pickup at the time they spoke with Fernen.

There was blood spattered about on the interior of the pickup and on the door on the passenger's side. A scoop shovel was stuck handle down behind the driver's seat. This was not present at the time Connie and Mr. Epke talked with Fernen. The headliner on the ceiling of the pickup behind the driver's seat was bent in.

Fernen was taken to the hospital in Rosebud where he died at approximately 8:15 that evening. The cause of death was pulmonary edema resulting from a gunshot wound to the head. The autopsy revealed that Fernen had been shot through the

forehead with a .22 caliber rifle from a distance of less than twelve inches. He had also been shot in the neck. Both the left and right jaws had been fractured and several teeth had been broken loose, apparently the result of forceful blows from a blunt instrument.

At about 6:30 p.m. that evening, defendant and his wife and his brothers Bruce and Ed came to the home of one Dan Clapper and asked to use the telephone. Defendant in Mr. Clapper's presence called Peter Pitchlynn, who had retired as a special officer in charge of the law and order division of the Bureau of Indian Affairs on the Rosebud Reservation shortly prior to November 8, 1969. Mr. Pitchlynn was told by defendant that he should go out and immediately investigate the scene of the incident involving defendant, his brother Bruce, and Kenneth Fernen. Defendant told Pitchlynn that he and Bruce had had a set-to with Fernen and that in the fracas Bruce had taken a rifle away from Fernen and that Bruce had gotten shot in the chest. Defendant stated that Fernen had gone for a gun in his belt at the time Bruce took the rifle away from him.

Defendant attempted to telephone his attorney, Charles Johnson, but was unable to get in touch with him.

Later that evening the sheriff of Todd County searched defendant's car at the hospital parking lot in Winner, South Dakota, pursuant to a search warrant and recovered Fernen's .22 caliber rifle from where it was lying on the rear floorboard under some clothes. Blood spots found on the butt of the rifle were identified as being of the same blood group as Fernen's blood.

The doctor who examined and treated Bruce in the Winner hospital on the night of November 8, 1969, testified that Bruce had suffered a bullet wound in the right flank just below the ribs midpoint between the abdomen and back; the path of the bullet was parallel to the ground. Bruce also had bruises around the eyes and had suffered a black eye. According to the physician, Bruce did not conduct himself rationally during the time that he was being treated in the hospital. There was further evidence that Bruce remained irrational after November 8, 1969, and that

sometime during the spring of 1970 he was committed to the State Hospital at Yankton, South Dakota, although the circumstances of this commitment and by whom it was initiated are not entirely clear from the record. It appears that Bruce has never been brought to trial on any charges arising out of the death of Kenneth Fernen, and so far as we are able to ascertain from the record he is still a patient at the Yankton State Hospital.

The physician who examined and treated the defendant on November 10, 1969, reported that defendant had facial abrasions, a fractured nose and two fractured ribs.

The evidence revealed that until 1966 Fernen was on reasonably friendly terms with defendant and Bruce. Their ranches were within a few miles of each other and the Zeminas occasionally stopped at the Fernen ranch for coffee and rolls. On March 1, 1966, Fernen's lease on a quarter of Indian trust land being administered by the Bureau of Indian Affairs lapsed when he failed to submit a renewal application. Defendant's wife, Clara Zemina, a member of the Rosebud tribe, applied for and secured a lease on the land. This particular quarter section lay immediately south of the property on which Fernen's ranch home and buildings were located.

Defendant put in a fence on the boundary line between the leased quarter and the Fernen property in order to keep Fernen's cattle off the leased land. This caused Fernen to become quite angry with defendant and resulted in an altercation in June of 1966 during which Fernen struck defendant on the face and head several times. Defendant later brought a damage suit against Fernen for assault and battery and for interference with possession of his land and obtained a judgment of some $2500. Defendant's attorney attempted to make arrangements with Fernen for the payment of the judgment and on November 3, 1969, informed Fernen by letter that unless Fernen paid some more money on the judgment further action would be taken to collect the judgment. There was evidence that Fernen had told the Realty Officer at the Rosebud Agency on several occasions that he did not intend to let the Zeminas fence him out. Bureau of Indian Affairs law enforcement officers had received numerous

calls to go out and settle difficulties between the Zeminas and Fernen arising from the fencing of the leased quarter.

Defendant took the stand on his own behalf and testified generally as follows: On the afternoon of November 8, 1969, he and Bruce had been baling hay and moving haystacks. Toward sundown they started back toward the defendant's ranch with their equipment. After Connie Grablander's car had met and passed his tractor, defendant looked back and saw Bruce stop and get off his tractor and look under the front of the hay sled. Defendant stopped his tractor and waited for Bruce to come back from where he had walked to the back of the hay sled. Upon Bruce's failure to return, defendant walked back to the hay sled, where he heard air coming out of one of the tires. He heard a horn honking so he walked around to the back of the hay sled and saw Bruce's feet sticking out past the open door on the driver's side of the pickup truck. Defendant thought that Bruce was trying to unhook the stuck horn. Defendant testified that he did not know whose pickup it was, although there was testimony that Fernen had owned the green pickup for some time and that defendant must have seen it on numerous occasions prior to November 8, 1969.

Defendant testified that as he approached the open door he thought he heard a gun go off. He saw that Bruce had hold of a rifle and that Fernen, who was sitting on the seat, had one hand on the gun barrel and the other one around Bruce in a headlock. Defendant told Fernen to let go of Bruce and then gave Fernen a short punch on the side of the head. Fernen kicked him in the nose and in the chest, causing defendant to fall to the ground. When defendant regained his feet he saw Bruce standing at the open right-hand door of the pickup trying to jerk the rifle away from Fernen, who was trying to pull out the magazine tube. Defendant heard the gun go off again and saw Bruce fall back, take the rifle, and hit Fernen with it, saying "Stay there now you son of a bitch. I got the gun." Defendant took the rifle and assisted Bruce back to the tractor attached to the hay sled. Defendant put Bruce on the hay sled and then drove the tractor toward defendant's home. They were met by defendant's wife in the car, whereupon they picked up Ed and then drove to the Clapper residence to make the phone calls.

On cross-examination defendant admitted that he saw no gun other than the .22 caliber rifle. He testified that he knew nothing about the scoop shovel that was stuck behind the passenger's seat of the pickup, nor did he know how or when the driver's door of the pickup was closed or by whom. He claimed to have no knowledge of who threw the keys into the ditch.

■ The court did not err in denying defendant's motion for a directed verdict of acquittal. The evidence established that the defendant was present at the scene and that there was a terrific struggle in and about Fernen's pickup, during which Fernen was brutally beaten and was shot twice with his own rifle. Defendant bore signs of having been recently involved in a fight. Whatever weaknesses there may have been in the state's case in chief, the evidence at the close of the case was sufficient to support the jury's verdict of first degree manslaughter. What was said in State v. Olson, 83 S.D. 493, 161 N.W.2d 858, is applicable here:

"* * * Defendant did not rest upon his motion, but presented evidence after denial thereof and rebuttal evidence was introduced by the state. The denial of a motion for directed verdict for failure of proof is not reversible error if proof is afterwards supplied by either party. The introduction of evidence by defendant is not deemed a waiver of the motion. This court, however, considers all the evidence in determining whether denial of the motion was reversible error." 161 N.W.2d 858, 859.

■ Defendant contends that the court erred in failing to instruct the jury with respect to excusable or justifiable homicide or self-defense. SDCL 22-16-16 provides that:

"Homicide is manslaughter in the first degree when perpetrated without a design to effect death and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

As this court held in State v. Johnson, 81 S.D. 600, 139 N.W.2d 232, the issues of excusable or justifiable homicide are matters of defense and the absence thereof is not a portion of the description of the offense. The court is not required to instruct as to matters that find no support in the evidence.

Defendant contends that because the state had charged him with murdering Fernen it was error to allow the state to submit the case to the jury on alternative theories that he had killed Fernen or had aided and abetted his brother Bruce in the killing. He argues that before one can be charged and convicted on a theory of aiding and abetting the commission of an offense the state must first prove that the principal was guilty of the crime in which the defendant aided and abetted.

SDCL 23-10-3 abrogates the distinction between a principal and an accessory to the commission of a crime:

> "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, must be prosecuted, tried, and punished as principals."

SDCL 23-10-4 provides that:

> "No additional facts need be alleged in any indictment or information against an accessory before the fact than are required in an indictment against his principal."

SDCL 23-10-5 provides that:

> "An accessory to the commission of a felony may be prosecuted, tried, and punished, though the principal be neither prosecuted nor tried, and though the principal may have been acquitted."

SDCL 22-3-3 provides that:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals."

As was stated in State v. Bachelor, 67 S.D. 259, 291 N.W. 738:

"The effect of these two sections of the Code [SDCL 23-10-3 and 23-10-5, supra] is to do away with the necessity, in the prosecution, of any reference to a defendant as an accessory. A party who aids and abets another in the commission of a criminal offense is himself a principal in the commission of such offense and is to be tried the same as though he were actually a principal and the record of the conviction of the principal, either by verdict or plea of guilty, is not evidence, prima facie, or otherwise of the guilt of an accessory."

See also State v. Peck, 82 S.D. 561, 150 N.W.2d 725; State v. Cunha, Iowa, 193 N.W.2d 106; Oaks v. People, 161 Colo. 561, 424 P.2d 115.

█ Federal law provides that "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C.A. § 2(a). It is not necessary in an indictment under Federal law to allege that a person is guilty of aiding and abetting, and one may be convicted as an aider and abettor even though he is not charged in that capacity. United States v. Lugo-Baez, 8 Cir., 412 F.2d 435; United States v. Thomas, 8 Cir., 469 F.2d 145. In Theriault v. United States, 8 Cir., 401 F.2d 79, 85, a defendant who had been charged with bank robbery contended that it was error to submit the case to the jury on aiding and abetting instruction since defendant had not been charged with a violation of 18 U.S.C.A. § 2(a). In considering the claim that defendant had been convicted of a crime with which he was not charged, the court stated that:

"* * * We, of course, have no way of knowing whether the jury reached its conviction conclusion through the aiding and abetting route. But even if it did, Nassif v. United States, 370 F.2d 147, 155 (8 Cir. 1966), is adverse authority to the defense position. This court there said 'An aider and abettor may be indicted directly with the commission of the substantive crime and the charge may be supported by the proof that he only aided and abetted in its commission.' " 401 F.2d 79, 85.

The information in the instant case charged that the defendant ". . . did willfully, unlawfully, feloniously and with malice aforethought effect the death of a human being, namely, Kenneth Herbert Fernen," and did not specify the exact means by which Fernen's death was brought about. Consequently, defendant's reliance upon State v. Stewart, 37 S.D. 263, 157 N.W. 1046, is misplaced, since in that case the state had elected to charge the defendant with personally firing a rifle at the victim, whereas the jury was instructed that the defendant could be convicted even though he was not armed with a rifle and did not fire the shot that injured the victim but had merely aided and abetted his son in the act of shooting the victim with a revolver. When read in the light of its facts and the specificity of the information, the decision in State v. Stewart is not inconsistent with the position we take in the instant case. State v. Bachelor, supra, Theriault v. United States, supra. We conclude that defendant was properly charged under the aiding and abetting statutes.

■ Contrary to defendant's contention, the court's instructions concerning the aiding and abetting issue adequately stated the applicable principles of law. Instruction No. 23, although it could well have been more carefully worded to fit the circumstances of the case, informed the jury as to the law set forth in SDCL 22-3-3, SDCL 23-10-3, SDCL 23-10-4 and SDCL 23-10-5.

Instruction No. 24 stated that:

"The mere presence of a person at the commission of the crime does not make him guilty of the crime unless he participates in the crime or aids, abets, or assists another in the commission of the crime.

"In order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say that he willfully seek by some act or commission of his to make the criminal venture succeed."

We think that when read together the instructions adequately informed the jury of the elements required to be proved before they could convict the defendant on the theory that he had aided and abetted his brother Bruce in the offense of first degree manslaughter. State v. Johnson, supra; State v. Weinandt, 84 S.D. 322, 171 N.W.2d '73. Defendant's objections to other instructions have been considered and are found to be without merit.

■ Defendant complains that the prosecutor made highly prejudicial and improper statements during final argument with respect to the aiding and abetting instructions. Upon objection by defense counsel, the court instructed the prosecutor to keep his argument within the framework of the instructions. The error, if any, was thus remedied. Other alleged instances of improper argument do not rise to the level of reversible error.

■ We have considered defendant's assignments of error concerning the admission and rejection of certain evidence and we conclude that the trial court did not err with respect to these matters. Specifically, the trial court did not err in admitting the pictures of decedent's face showing the bullet wounds and the abrasions, notwithstanding the fact that one of the pictures also revealed the tracheotomy incision made at the hospital in an effort to preserve decedent's life. State v. Zobel, 81 S.D. 260, 134 N.W.2d 101; State v. Austin, 84 S.D. 405, 172 N.W.2d 284. Likewise, the court did not err in admitting the results of the analysis of the blood sample taken from decedent's body.

█ Defendant attempted to introduce a lead slug that was allegedly found inside the tube of one of the tires on the hay sled. The court sustained an objection to the receipt of this evidence on the theory that no proper foundation had been laid with respect to the custody of the tire and tube from the time they were returned to defendant. An examination by law enforcement officers shortly after the offense revealed no slug in the tube and no bullet holes in the tire or tube. We think that it was within the trial court's discretion in refusing to admit this proffered evidence and testimony relating thereto.

The conviction is affirmed.

BIEGELMEIER, C. J., and HANSON and WINANS, JJ., concur.

DOYLE, J., not participating.