STATE of South Dakota, Plaintiff
and Appellee,

v.

Jimmy Don WEATHERFORD,
Defendant and Appellant.

No. 15559.

Supreme Court of South Dakota.

Argued Sept. 1, 1987.

Decided Dec. 2, 1987.

Mark Smith, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., and Richard D. Coit, Asst. Atty. Gen., Pierre, on brief.

John Feehan, Bettmann & Feehan, P.C., Rapid City, for defendant and appellant.

WUEST, Chief Justice.

Defendant, Jimmy Weatherford, appeals his conviction on two counts of murder in the first degree and one count of attempted murder in the first degree. We affirm.

### STATEMENT OF FACTS

In early March of 1986, the defendant, Jimmy Don Weatherford (Weatherford), arrived in Rapid City with his common-law wife, Angela Koricanek (Angela). Defendant became acquainted with David Engelbrecht (Engelbrecht). On or about March 10, 1986, defendant and Angela moved to Talia Haefs' residence at 615 St. Patrick Street in Rapid City. Engelbrecht, a friend of Talia's, had been living at the house since the end of February.

Testimony indicates on the evening of March 22, 1986, the defendant, Angela, and Engelbrecht went to the Outer Limits Bar several miles north of Rapid City. Upon arriving at the Outer Limits Bar the Defendant, Angela and Engelbrecht played some pool and then seated themselves at a booth near the dance floor. After sitting through about three or four dances, defendant asked Angela if she would dance with him. Angela, who had been drinking quite heavily, refused. Defendant waited awhile and again asked her if she would dance. In response, Angela then told defendant to get out of her face and warned him that if he didn't do so she would round up a bunch of bikers and have them beat him up. Defendant decided to leave her alone for awhile and went to his pickup truck where he sat until about 11:30 p.m. At that point, defendant returned to the bar but before doing so he removed a .22 caliber pistol from the footlocker inside the camper of his pickup and placed it under the front tire.

Upon reentering the bar defendant returned to the booth near the dance floor and observed Angela seated by Engelbrecht. Defendant grabbed Angela, Engelbrecht intervened, and all three started arguing and fighting. Defendant then tried to persuade Angela to leave with him but again she indicated that she did not want anything to do with him and refused to leave. Defendant picked Angela up and proceeded to forcefully remove her from the bar. Defendant drug her out and shoved her into his pickup. Moments later, she jumped out the driver's side door and ran back to the bar. Defendant returned to his pickup, grabbed his gun from behind the tire, got into the vehicle and drove off.

Defendant drove to Talia's house where he and Angela had been staying. He parked his pickup, grabbed his gun and went into the kitchen to wait for Engelbrecht and Angela. At approximately 2 a.m. Angela and Engelbrecht arrived and immediately the three began arguing. Defendant grabbed Angela by the hair and

pushed her down the stairs toward the basement exit through the utility room. Engelbrecht tried to grab Angela and pull her away, but was unsuccessful. Talia went down the stairs and positioned herself between the defendant and Angela. She then heard Engelbrecht yell, "He's got a gun." Defendant pulled the gun and commenced firing.

When the shots were fired Erick Metz (Metz) was in the living room headed toward the kitchen from his bedroom. Upon hearing the shots he immediately picked up the phone and called the police. While on the phone he observed, through a kitchen window, the defendant walking toward his pickup with a revolver in his hand.

Law enforcement officials and medical personnel were immediately dispatched to the residence at 615 St. Patrick Street. Angela was found dead at the scene. Engelbrecht and Talia were rushed immediately to the Rapid City Regional Hospital for surgery. Portions of a bullet were removed from Engelbrecht's head and a bullet was removed from Talia's spine. The bullet had severed her spinal cord and, as a result, she was rendered paralyzed from the waist down. Both Engelbrecht and Talia survived their operations. However, approximately three months later, Talia died from complications arising as a result of her paralysis.

A short time after leaving Talia's residence on March 22, 1986, defendant's pickup was seen on Highway 16, near Rockerville, by Deputy Brunner of the Pennington County Sheriff's Department. Brunner called for assistance and followed the vehicle into a grove of trees near Old Keystone. Backups arrived and the vehicle was surrounded. Approximately one-half hour later, the Rapid City Tactical Team arrived, and after negotiation, the defendant gave himself up peacefully.

## I. Change of Venue

Defendant filed with the trial court a motion for change of venue pursuant to the provisions of SDCL 23A–17–5. Defendant introduced a copy of an article from the front page of the Rapid City Journal dated September 5, 1986, and a report containing statistics on the circulation of the Journal in the Rapid City area. Defendant's counsel argued that the Rapid City Journal article was so inflammatory and knowledge of it so widespread that Defendant could not possibly receive a fair and impartial trial in Pennington County.

The trial court denied defendant's motion but not unconditionally. The trial judge indicated he would reconsider the ruling if there was difficulty selecting an impartial jury through voir dire.

■ The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). In a criminal case, a change of venue shall be ordered upon motion if the court is satisfied that there exists, in the county where the prosecution is pending, so great a prejudice against a defendant that he cannot obtain a fair and impartial trial in that county. SDCL 23A–17–5. The test is whether there is, in fact, prejudice in the minds of the county residents sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial. *State v. Christians*, 381 N.W.2d 214 (S.D.1986); *State v. Brandenburg*, 344 N.W.2d 702 (S.D.1984); *State v. Wellner*, 318 N.W.2d 324 (S.D.1982).

■ The law presumes that a defendant can receive a fair trial in the county in which the offense is committed. *Christians, supra; State v. Luna*, 378 N.W.2d 229 (S.D.1985); *Brandenburg, supra*. The burden of establishing that a fair and impartial trial cannot be had is upon the applicant. *Christians, supra; Luna, supra; Brandenburg, supra*. Whether a change of venue should be granted is a matter within the sound discretion of the trial court, and we will not disturb the trial court's decision unless there is an abuse of discretion. *Christians, supra; State v. Reutter*, 374 N.W.2d 617 (S.D.1985); *Brandenburg, supra*.

■ Pretrial publicity alone is not enough to deny a fair trial or, in other

words, to warrant a change in venue. *Luna, supra; Reutter, supra; State v. Reed,* 313 N.W.2d 788 (S.D.1981). Courts have acknowledged that prospective jurors will have some knowledge of pending criminal cases by the pervasive influence of the communications media. *United States v. Delay,* 500 F.2d 1360 (8th Cir.1974). Pretrial publicity does not per se provide a sufficient basis for a change of venue; there must be additional evidence tending to show that such publicity was so prejudicial as to prevent the defendant from receiving a fair and impartial trial in the county. *United States v. Buttorff,* 572 F.2d 619 (8th Cir.1978), *cert. denied* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 199 (1978); *Delay, supra; United States v. Ringland,* 497 F.2d 1250 (8th Cir.1974); *Brandenburg, supra; Reed, supra.* The burden rests with the accused to establish that an impartial trial is not possible in the face of pretrial publicity. *State v. Reiman,* 284 N.W.2d 860 (S.D.1979).

■ If the jurors were unaware of the pretrial publicity or could not recall it, or if knowledge of the publicity did not cause a prejudicial opinion to be formed, a change of venue would be unwarranted. *United States v. Young,* 553 F.2d 1132 (8th Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278; *Ringland, supra; United States v. McNally,* 485 F.2d 398 (8th Cir.1973), *cert. denied* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874. Furthermore, while entitled to an impartial jury, a defendant is not deprived of that right if a juror has knowledge of the case as long as the juror is willing to lay aside any opinion he has formed and base a verdict totally on the evidence received in court.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975), *quoting Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). *See also, McNally,* 485 F.2d at 403.

In *Irvin, supra,* the United States Supreme Court held that adverse pretrial publicity can create such a presumption of prejudice in a community that the juror's claims that they can be impartial should not be believed. The Court in *Irvin* reviewed a number of factors in determining whether the totality of the circumstances raised such a presumption. The Court noted, however, that the trial court's findings of impartiality might be overturned only for "manifest error." 366 U.S., at 723, 81 S.Ct., at 1645. The Court has also presumed prejudice under the extreme circumstances under which other trials were held. *See, Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed. 2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

■ Approximately 134 prospective jurors were impaneled. A total of seventy-nine prospective jurors were examined from which twelve jurors and two alternates were chosen. Following voir dire, defendant renewed his motion for a change of venue. The trial court, based upon the success of jury selection through individual voir dire, again denied defendant's motion.

If there was, as defendant argues, substantial county-wide prejudice in this case, it was certainly not exposed during individual voir dire. Of the seventy-nine potential jurors, fifty-six admitted that they had heard or read something about the case. However, only nine specifically remembered reading the September 5th article. Twelve of the fifty-six had not heard or read anything about the case until recently and were only aware of facts concerning the trial itself and jury selection. Of those who had heard or read about the case, only twelve had formed an opinion as to defendant's guilt, and upon challenge by defendant, all were excused.

The record on appeal does not indicate the jurors ultimately selected to hear the case were unable to render an impartial verdict. Four of the twelve jurors chosen had neither read nor heard anything about the case. The remaining jurors had read or heard very little and each indicated that he or she had formed no opinion as to defendant's guilt. Moreover, none of the jurors chosen remembered reading the Rapid City Journal article.

Based on the *voir dire*, the trial court concluded that an impartial jury was impaneled. We agree. An examination of the *voir dire* record shows no evidence of actual prejudice. None of the jurors had even formed an opinion. Moreover, while the Journal article was inflammatory, we do not believe that the article is enough under the totality of the circumstances to raise a presumption of prejudice. As none of the members of the jury had read the article, none of them were influenced by it, and all were passed for cause by defendant. We therefore conclude the trial court did not abuse its discretion in denying the motion for change of venue.

## II. Polling Expert

■ Generally, a motion for change of venue must be accompanied by affidavits or other evidence in the record. *State v. Lufkins*, 309 N.W.2d 331 (S.D.1981). Defendant was unable to produce such evidence of prejudice and asked the trial court to appoint a polling expert to conduct a public opinion survey for evidence supporting the motion for change of venue. The court denied the motion.

■ The refusal of the trial court to grant a motion for a public opinion survey rests within the sound discretion of the trial court. *State v. Bonrud*, 393 N.W.2d 785 (S.D.1986); *State v. Marshall*, 264 N.W.2d 911 (S.D.1978). Based on its experience, the trial court felt that a poll was unnecessary and also probably less reliable than the voir dire process in determining community and individual prejudice.

We do not believe the trial court abused its discretion in denying defendant's motion for a survey. Voir dire examination is the better forum for ascertaining the existence

of hostility towards the accused. *Reutter*, 374 N.W.2d at 629; *Reiman*, 284 N.W.2d at 867.

In this case the voir dire examination indicates that only twelve potential jurors had formed an opinion as to defendant's guilt, and all twelve were removed for cause. Moreover, the results of the voir dire indicate an impartial jury was impaneled. None of the jurors read the Rapid City Journal article, none of them had formed an opinion as to defendant's guilt, all were passed for cause by the defendant, and there is no claim that any member of the jury was biased and yet allowed to sit on the jury. We therefore find no abuse of discretion.

## III. Physical Restraints

At a hearing defendant took the stand to testify as to the circumstances leading to his interviews with Detective Chris Grant. During cross-examination by the state's attorney, the defendant refused to answer several of the questions asked, told the judge to hold him in contempt, and abruptly left the witness stand. The defendant was obviously angry and did not retake the stand until after a ten minute recess following discussion with his trial counsel.

On October 3, 1986, the defendant appeared before the trial court for a motion hearing. At such hearing the trial court indicated that leg irons would remain on the defendant during trial. Defendant's counsel objected to the use of leg irons at trial and now contends, as argued below, that the shackling of defendant had a significant effect on the jurors' feelings toward the defendant and, as a result, violated his constitutional right to a fair trial secured by the Sixth and Fourteenth Amendments to the United States Constitution, and Art. VI, §§ 2 and 7 of the South Dakota Constitution.

■ "As a general rule, a defendant in a criminal case has the right to appear before the jury free from shackles or other physical restraints." *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Harrell v. Israel*, 672 F.2d 632, 635 (1982); *Kennedy v. Cardwell*, 487 F.2d 101

(6th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); A person accused of a crime is presumed innocent until his guilt has been established beyond a reasonable doubt. For this presumption to be effective, courts must guard against practices which unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion. As one court has observed, if a defendant is to be presumed innocent, he must be allowed the "indicia of innocence." *Harrell*, 672 F.2d at 635. Whenever a courtroom arrangement is challenged as inherently prejudicial, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

However, a defendant's right to appear at trial free from physical restraint is not absolute. In *Allen* the United States Supreme Court held that binding and even gagging a defendant is permissible when necessary to control contumacious conduct at trial. Further, "the use of physical restraints has also been upheld in the absence of disruptive conduct at trial where the trial court has reason to believe it is necessary to maintain the security of the courtroom" *Harrell, supra*, at page 635, *citing Loux v. United States*, 389 F.2d 911, 919 (9th Cir.), *cert. denied*, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968); *See also State v. Evans*, 169 N.W.2d 200 (Ia.1969).

The decision to physically restrain a defendant in the jury's presence necessitates a balancing of interest. The decision to impose restraints is within the trial court's discretion and the trial judge has wide discretion in determining whether the applicable constitutional standards have been met. "It is he who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, the escape of the accused, and the prevention of other crimes." *Harrell*, 672 F.2d at 636.

There may have been no incidences of misconduct on the part of defendant during the trial, but prior to trial defendant acted in a manner which caused concern and convinced the trial court that shackles were necessary. In response to defendant's objection to the use of leg irons at trial, the trial court stated:

Well, you see, I guess the decision is a result of his own actions in front of me last week and it was enough to concern me and his temper and if it's likely to flash, I don't want him being able to get very far, if it flashes, so until I am advised otherwise, he is going to attend the trial with his leg irons on.

As indicated by the record, the defendant laughed at the court in response to the above statement. His actions gave the court reason to suspect that he might in some manner attempt to disrupt the trial.

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and can not be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.

*Allen, supra*, 90 S.Ct. at 1061, 397 U.S. at 345, 25 L.Ed.2d at 359.

Defendant claims in his brief that the shackling of his feet occurred. However, there is nothing in the record indicating that defendant actually was forced to wear leg irons.

In its brief, the State argues the trial court took all possible precautions to prevent the jury from seeing or focusing on the defendant's leg irons. The State claims a panel was placed around defendant's table so that the jurors could not see the defendant's feet and the defendant was placed in his chair before the jurors came into the courtroom and only left the courtroom after the jurors had departed.

The State also notes that in *Harrell, supra,* the trial court acted similarly, and its efforts were deemed significant in reviewing the constitutional propriety of the restraints imposed. The court held therein that the imposition of restraints may not have been fully justified under the circumstances but, in light of the precautions taken, the petitioner was adequately protected from the possibility of prejudice and his constitutional rights were not violated. While the State's argument is meritorious, it is also clear the record does not indicate whether these precautionary measures were taken.

Without a record of the defendant appearing in shackles, we cannot address the merits of this issue or determine whether there was an abuse of discretion. While the state cannot show precautionary measures were taken, defendant has not shown he wore physical restraints or made a record on that issue.

IV. Proposed Jury Instructions

Defendant presented evidence at trial through his testimony and prior statements that he blacked out and was unconscious at the time the offenses were committed. Defendant's counsel proposed instructions 8, 9, 17 and 30, which set forth the essential elements of each crime charged as defined by statute but which also included defendant's "consciousness" as an essential element of the crime. The proposed instructions stated that, as an essential element of the crime, the state must prove beyond a reasonable doubt that "the defendant was conscious of the acts committed by him." Defendant contends on appeal that the trial court's refusal of proposed instructions 8, 9 and 17 improperly excluded from the jury's consideration an essential element of each crime charged and also denied him a fair opportunity to present his defense.

South Dakota has, under SDCL 22-3-1, recognized that where a person commits an act without being conscious thereof, the act is not a criminal act even though it would be a crime if it had been committed by a person who was conscious.

The trial court instructed the jury as to the essential elements of first degree murder and attempted first degree murder. It excluded from those instructions any reference to consciousness of the defendant and in doing so stated:

You have included a fourth element that the defendant was not conscious of the acts committed by him and that is the defense which has been raised by the evidence, but when we are talking about the elements of the crime, it is not one of the elements of the crime as set forth in the body of the statute because the concept of premeditated design includes the state or element of intent which you are addressing in your consciousness. I just don't think your proposed defense raises to the level of becoming a distinguishable element of the offense and your theory on consciousness will be given later on, so I am going to refuse your instructions.

However, the court instructed the jury on the issue of consciousness through the trial court's Instruction 38A. The trial court stated therein that "the burden of proof rests upon the State to prove that Defendant was conscious at the time he committed the act, or acts, constituting the offenses charged beyond a reasonable doubt."

█ As indicated by the trial court, consciousness of the defendant does not rise to the level of an additional essential element of each crime charged. Consciousness is necessarily included or implied within the specific intent element of a first degree murder charge but does not constitute an actual statutory element of the offense. "Issues of excusable or justifiable homicide are matters of defense and the absence thereof is not a portion of the description of the offense." *State v. Zemina,* 87 S.D. 291, 206 N.W.2d 819, 823 (1973).

V. Instruction 38A

Defendant claims Instruction 38A, which stated in part that "when a person acts as if he were conscious, then you are permitted to infer that he was conscious, but you are not required to do so," is error. Defendant claims such language improperly

shifted the burden of persuasion on the issue of consciousness to the defendant and correspondingly relieved the State of its burden to prove beyond a reasonable doubt that defendant acted with a premeditated design or specific intent to kill.

■ The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Francis v. Franklin*, 41 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344, 352 (1985), *citing In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Accordingly, the State may not use evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of any essential element of the crime or crimes charged. *Francis*, 105 S.Ct. at 1970.

■ A reading of Instruction 38A in its entirety clearly indicates that the burden of persuasion on the issue of consciousness was on the State and that evidence other than the inference should be considered on the issue. The language used was "merely another way of saying that the defendant [had] a duty of going forward with the evidence, and it is entirely consistent with the rule that the defendant has only the burden of producing evidence which would raise a reasonable doubt in the minds of the jury." *People v. Nihell*, 144 Cal. 200, 77 P. 916 (1904). Inclusion within Instruction 38A of the language indicating that the burden of proof rests on the State to prove the defendant was conscious at the time he committed the act, or acts, constituting the offense charged, is consistent with the proper burden.

### VI. Proposed Jury Instructions

At arraignment defendant specially pled "not guilty and not guilty by reason of insanity" to the charges in the Information. Consistent therewith, his counsel proposed Instructions 39, 40, 41, 42, 43, 44 and 47 on the issues of insanity and mental illness. The trial court refused the instructions on grounds that the record was completely void of any evidence suggesting that defendant was insane or mentally ill as those terms are defined in the statues.

Defendant contends that in light of the evidence of unconsciousness presented at trial the trial court was obligated to instruct the jury on his defense of insanity. In his opinion, if one is unconscious he is also insane as defined by statute, and an instruction on unconsciousness necessarily requires an additional instruction on insanity.

Insanity is defined under SDCL 22-1-2(18A) as "the condition of a person temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against him, he was incapable of knowing its wrongfulness, but not including an abnormality manifested only by repeated, unlawful or antisocial behavior."

It is well established, as defendant has stated, that "a defendant is entitled to an instruction on his theory of defense if there is evidence to support it and a proper request is made." *State v. Esslinger*, 357 N.W.2d 525, 532 (S.D.1984). However, "conversely he is not entitled to an instruction if there is no evidence to support his theory." *Esslinger, supra; See also Zemina,, supra; State v. Johnson*, 81 S.D. 600, 139 N.W.2d 232 (1965).

■ As the trial court noted in refusing the proposed instructions, defendant offered no expert testimony suggesting that at the time of the shooting he was suffering from a mental disease or defect which affected his mental facilities. Although related, "the defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind." *State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348, 360 (1975). This Court recognized that the defenses are distinct and separate in *State v. Grooms*, 85 S.D. 532, 186 N.W.2d 889 (1971).

Unconsciousness is a defense separate and distinct from insanity and defendant's proposed instructions on the issue of insan-

ity were properly refused. *See Caddell, supra,* at 360.

### VII. Motion to Dismiss

██ Defendant filed with the trial court a motion to dismiss and Suppress on grounds that the affidavit and reports submitted by Detective Grant of the Rapid City Police Department were insufficient to establish probable cause for the issuance of a formal arrest warrant. The motion was denied.

In its conclusions of law filed upon denial of defendant's motion the trial court stated the adequacy or inadequacy of the materials submitted to establish sufficient cause for the issuance of an arrest warrant was of no legal significance in this case. The court held the arrest by detective Grant lawful as a citizen's arrest under SDCL 23A-3-3, was proper for assistance of Pennington County authorities under SDCL 7-12-1, and was made as a felony arrest in "fresh pursuit" under SDCL 23A-3-17 and SDCL 23A-3-19.

We agree with the trial court. Since the initial arrest was lawful, any deficiences in Grant's subsequent affidavit in support of an arrest warrant has no bearing here.

### VIII. Photo Identification

Following Defendant's arrest, officer John Wenande of the Rapid City Police Department interviewed a number of witnesses who had been at the Outer Limits Bar on the night of March 21, 1986. The witnesses were shown one photo of the defendant and asked whether they had seen him at the Outer Limits on that evening. All recognized the defendant from the photo and responded affirmatively.

Prior to trial, defendant filed a motion to suppress the identifications of the defendant based on the one photo lineup and further requested that any in-court identifications by the witnesses be suppressed. The motion was denied.

Defendant's counsel argues on appeal that the trial court erred in denying the motion because the use of a one photo lineup was impermissibly suggestive under the circumstances and violated defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Art. VI. §§ 2 and 9 of the South Dakota Constitution. In response, the State simply argues that even if "impermissibly suggestive" the one photo identification by the witnesses did not affect any substantial rights of the defendant and must be disregarded under SDCL 23A-44-14.

██ An error involving a denial of a constitutional right can be harmless, not requiring the automatic reversal of a conviction, if the court is able to declare a belief beyond a reasonable doubt that it was harmless and did not contribute to the verdict obtained. *State v. Heumiller,* 317 N.W.2d 126 (S.D.1982).

██ The in-court identification of defendant was merely cumulative evidence with little probative value. A review of the Exhibits indicates that defendant admitted being at the Outer Limits Bar several hours prior to the shootings at Talia Haefs' residence. He admitted speaking with Richard Page, the bouncer, while at the bar. Further, he admitted fighting with David Engelbrecht while at the bar and also that he struggled with Angela Koricanek and carried her out to his pickup. The admissions were reaffirmed by defendant during cross-examination at trial by the state's attorney.

### IX. Illegal Arrest

In conjunction with defendant's motion to dismiss and suppress addressed under Argument VII herein, defendant filed with the trial court a motion to dismiss and suppress based upon an illegal arrest. The motion was denied.

██ Defendant contends the trial court erred in denying the motion specifically because the citizen's arrest by Detective Chris Grant of the Rapid City Police Department was illegal under the provisions of SDCL 23A-4-1. SDCL 23A-4-1 provides in pertinent part that:

A law enforcement officer making an arrest shall, without unnecessary delay, take the arrested person before the nearest available committing magistrate.

*Any other persons making an arrest shall, without unnecessary delay, take the arrested person before the nearest available committing magistrate or deliver him to the nearest available law enforcement officer.*

Defendant states that according to Detective Grant's testimony, he did not surrender the defendant to Pennington County authorities until after he had concluded three interrogations of the Defendant. Contrary to Defendant's contentions, however, neither the testimony of Detective Grant nor Sheriff Don Holloway of Pennington County indicates that defendant was in the sole custody of Detective Grant from the point of his arrest until after he had been interviewed.

Detective Grant and other members of the Rapid City Police Department tactical team were called out to the scene at Old Keystone by Sheriff Holloway. Defendant had taken a position in the camper of his vehicle and refused to peacefully remove himself at the request of Pennington County authorities. Detective Grant, as negotiator for the tactical team, was called to assist in an effort to get the defendant out of his pickup without trouble. Prior to Detective Grant's arrival at the scene the defendant's vehicle was surrounded by Pennington County law enforcement. At the time defendant removed himself from his vehicle and Detective Grant formally placed him under arrest, a number of deputy sheriffs were in close proximity to the Defendant. Pennington County Deputy Manolovitz searched the defendant and handcuffed him. Immediately thereafter the defendant was placed in a deputy sheriff's vehicle where Detective Grant advised him of his rights. He was then taken to Sheriff Holloway's unmarked vehicle and transported to Rapid City. In the vehicle with defendant were Detective Grant, Officer DeNamur of the Rapid City Police Department, and Sheriff Holloway.

During the first and second interviews defendant was continually in the presence of both Detective Grant and Sheriff Holloway. The third interview was conducted in the presence of both Detective Grant and Deputy Sheriff Bill Olson. Detective Grant testified that during the entire investigation, defendant was in his presence and in the presence of the sheriff or one of his deputies. He was never in his sole custody. Sheriff Holloway testified that defendant was in the custody of the Pennington County Sheriff's Office from the moment he was handcuffed by Deputy Manolovitz.

Under the circumstances, SDCL 23A–4–1 certainly did not require that Detective Grant formerly offer or surrender the Defendant to Pennington County law enforcement. Defendant was clearly in the custody of the Pennington County Sheriff's Department from the moment of his arrest and his argument is totally without merit.

Judgment of conviction is therefore affirmed.

MORGAN, SABERS and MILLER, JJ., concur.

HENDERSON, J., specially concurs.

HENDERSON, Justice (specially concurring).

I concur but write specially on "shackling."

South Dakota has admitted in its briefs before the Court that defendant was shackled and refers to "defendant's leg irons." It is bound by its advocacy.

Defendant, in his brief, appeals on the basis that he was shackled with leg irons. On the record, his counsel objected to leg irons.

State goes to great lengths to explain in its brief that any prejudicial effect was mitigated by placing a panel around defendant's table "so that the jurors could not see the Defendant's feet and the Defendant was placed in his chair before the jurors came into the courtroom and only left the courtroom after the jurors had departed." *See* Motions and Jury Matters Transcript, at pages 12–13. Therefore, this issue should not be skirted. Under the facts here, was there a constitutional impropriety of the restraints imposed? It is a question that the majority initially suggests is before us, but which the majority

opinion does not meet head-on. I choose to do so.

The most recent expression on physically restraining a defendant in the jury's presence which I can find is *Holbrook v. Flynn*, 475 U.S. 560, 568–70, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525, 534–35 (1986), setting forth that generally only exceptional circumstances will permit the imposition of physical restraints upon an accused and shackling should only be permitted when justified by an essential state interest. Every defendant, of course, is entitled to a presumption of innocence before the jury. When law enforcement brings the defendant—shackled—into the courtroom, there is a devastating effect on his presumed innocence. A clatter of chains chills the beauty —the impartiality—of the law and the right to a trial by a jury. "The constitution grants every defendant a presumption of innocence ... and the physical presence of shackles clearly erodes the presumption." *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir.1983) (citation omitted). Obviously, if there is threat to the security of the people in the courtroom and society at large, a trial judge owes a duty to protect the court officials, spectators, lawyers, and people in the building. A subjective analysis must emerge and a decision made by the trial judge. The following case reflects some good guidelines:

1. Seriousness of the present charge or charges against the defendant;

2. Defendant's temperament and character;

3. Defendant's age and physical attributes;

4. Defendant's past record;

5. The nature of the facility and the security of the courtroom;

6. Are there any adequate alternative remedies which are available?

*State v. Tolley*, 290 N.C. 349, 367–69, 226 S.E.2d 353, 368 (1976). In my reading on this subject, I am convinced that shackling is absolutely disfavored; only if there are "exceptional circumstances" is it favored. We ultimately arrive at a conclusion that a trial judge has broad discretion in the matter. His conclusion cannot clearly be against reason or evidence. Perhaps the six criteria set forth above may assist our South Dakota trial judges in the future.

Now, let us review the facts in light of the criteria:

1. Defendant was charged with murder and attempted murder, very serious charges;

2. Defendant's temperament was surly, disrespectful, and his character was bad;

3. Defendant was young enough and strong enough to be physically aggressive;

4. Defendant's past record was bad;

5. This courtroom was an excellent facility and there were two guards,[1] ever so present and watchful (impression on the jury here?);

6. Reasonable alternatives were chosen (panel to hide the leg irons and did not cause the defendant to walk to and fro in the eyesight of the jury).

Defendant argues there were no incidents during the trial itself to justify shackling. True. Did not, however, the two deputies and shackles prevent such outbursts?

Additionally, I note that the defendant's principal defense was "I blacked out" and "I was unconscious" at the time the offenses were committed. Couple this with his pleas of "not guilty and not guilty by reason of insanity" and the cautious mind begins to believe that we have a defendant, who, by his own admission, is very emotionally/mentally unstable. Therefore, is not the shackling consistent with the defense? Consider, also, that this trial judge previously witnessed an outburst of this defendant where he left the witness stand after he refused to answer several questions and told the judge to go ahead and hold him in contempt. His countenance was one of anger. When he was surrounded by deputies in his camper, he would not peaceably remove himself until he was overwhelmingly surrounded.

---

1. The record inferentially constructs the factual concept that they were armed.

Therefore, have we not seen defiance, belligerence, and disruption in this defendant? It can reasonably be opined that this trial judge did not abuse his broad discretion. In closing, I urge the trial courts of this state to use shackling only in extraordinary circumstances or in "extreme need." *Harrell v. Israel,* 672 F.2d 632, 635–36 (7th Cir.1982). Shackling should not become commonplace or the first alternative.[2] If adequate alternative remedies are available, they should be employed.

2. History is a great teacher. This nation nearly self-destructed over slavery: men in chains to be sold like cattle! Let us be vigilant about placing chains on people. We are the land of the free, the beacon of freedom, and the Republic to which people still flee from oppression.